IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 19, 2019 Session

**DARRELL DEAN HOCHHALTER v. STATE OF TENNESSEE**

Appeal from the Criminal Court for Davidson County
No. 2012-B-1816    Steve R. Dozier, Judge
_____

No. M2018-00243-CCA-R3-PC
_____

The petitioner, Darrell Dean Hochhalter, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, J.J., joined.

Patrick T. McNally, Nashville, Tennessee, for the appellant, Darrell Dean Hochhalter.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn Funk, District Attorney General; and Tammy Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Davidson County jury convicted the petitioner of six counts of sexual battery by an authority figure and one count of rape, for which he received an effective sentence of twenty-two years. *State v. Darrell Dean Hochhalter*, No. M2014-01106-CCA-R3-CD, 2015 WL 4556917, at *1 (Tenn. Crim. App. July 29, 2015), *perm. app. denied* (October 15, 2015). On direct appeal, the petitioner challenged the trial court's admission of the forensic interview of the victim at trial, the sufficiency of the evidence supporting his convictions, and his sentence. *Id.* This Court summarized the underlying facts leading to the petitioner's convictions, as follows:

This case arises out of the [petitioner's] numerous and various sexual encounters with his daughter, the victim, which occurred between April 22, 2008 and April 16, 2010. As a result, he was indicted for seven counts of sexual battery by an authority figure, one of which was dismissed before trial, as well as one count of rape. The [petitioner's] wife was charged with one count of facilitation of sexual battery by an authority figure, but her case was severed from the [petitioner's].

At trial, the victim, who was nineteen years old at the time of trial, testified that the [petitioner] was her father, and she had a sister who was four years younger than she. During the time period in question, her mother left for work around 8:30 a.m. and returned home around 5:00 or 6:00 p.m. The [petitioner] worked nights, leaving the home around 2:00 a.m. and returning around 9:00 a.m. Her grandmother also lived in the home, but she primarily stayed in her room downstairs or in the living room and kitchen on the main level. She rarely went to the upstairs level, where the bedrooms were located.

The victim said that she was homeschooled in the sixth grade by the [petitioner], but she returned to school for seventh and most of eighth grade. In April or May 2008, during her eighth grade year when she was thirteen years old, the [petitioner] withdrew the victim from school because the victim began cutting herself. The [petitioner] believed the victim's friends were a bad influence on her.

The victim said that she and the [petitioner] had "a great relationship" when she was little, but they grew apart as she became a teenager and wanted to be with her friends. During the time the [petitioner] homeschooled her after withdrawing her from the eighth grade, the victim's and [petitioner's] relationship "was strained but [they] were really close." She elaborated that the [petitioner] "was just trying to relearn [her]."

The victim recalled that, following her removal from school, the [petitioner] would wait in the bathroom while she showered, so he could check her legs afterwards to make sure she had not cut herself. The victim denied that the [petitioner] ever got in the shower with her or touched her in the shower. The victim acknowledged having previously told others that the [petitioner] had taken showers with her in order to conserve water and to make sure she was not cutting herself. She also acknowledged having previously told others that the [petitioner] "would grab [her] boob or smack [her] butt in the shower." The victim denied that the [petitioner] ever got in

the bathtub with her. However, she acknowledged previously stating on a number of occasions, including under oath, that the [petitioner] had done so.

After completing her homeschooled eighth grade year, the victim began attending Nashville School of the Arts ("NSA"), and the [petitioner] visited her at school. Someone from the Department of Children's Services ("DCS") spoke with the victim about concerns that had been raised at school concerning her relationship with the [petitioner]. Rumors were going around the school that she had been "making out" with the [petitioner]. The victim told the DCS worker that nothing had happened and that they were just "a very eccentric family." The victim acknowledged that her mother told her to tell DCS that nothing happened in order to protect their family. However, she explained that her mother was referring to the [petitioner's] grabbing her breasts and checking her hymen - the only two things she admitted actually happened. After DCS became involved, the victim's parents blamed her for telling her friends about the sexual abuse, and her parents discussed moving out of state to prevent the [petitioner] from going to prison. The victim recalled that her parents talked about how the victim's "inability to stay quiet about things happening" was going to have legal repercussions.

The victim acknowledged previously stating that she made the decision to disclose the abuse in 2011 because she was worried about her younger sister. At the time of the disclosure, the victim's sister was the same age that the victim had been when the abuse started, and the victim's sister was also being homeschooled. At trial, however, the victim testified, "It wasn't really a concern about sexual abuse, it was just a convenient thing that fit in with my story."

The victim agreed that she had been fearful her mother and sister would blame her if the [petitioner] went to jail, and she was worried about breaking up her family. However, she acknowledged that she had not broken up her family because, at the time of trial, she was living with her mother, her parents were still together, and she saw the [petitioner] occasionally even though he was not supposed to be around her. However, she denied that the [petitioner] came to her house when she was present. Asked if she wanted to be reunited with the [petitioner] and the family, she responded, "Maybe after a lot of counseling."

The victim claimed that she told stories about the [petitioner's] molesting her in order to make friends at school. She told her friends that she had taken showers and "naked naps" with her father. She elaborated that she told her friends that her father groped her breasts and buttocks during the showers and that he had erections during the naps. She also told them that, on one occasion, the [petitioner] tried to digitally penetrate her vagina. She explained that the [petitioner] "felt down there to see if [she] was aroused" and asked if she "was wet."

The victim stated that, in the tenth grade, she got caught performing oral sex on her boyfriend and was taken out of school. After that, she "used the stories that [she] had been telling [about the [petitioner]] to get out of the house because [she] wanted to be with [her] boyfriend at that time." She said that, after the incident with her boyfriend, the [petitioner] developed "all of these rules" and "beat[ ] the crap out of [her] every morning," so she did not want to be at home and used the stories she had told her friends over the years to get out of the house. She stated that she told Jenny White, her former youth leader, about the alleged abuse because she was afraid of not being able to see her boyfriend again. However, she acknowledged that a few days before she disclosed the abuse to Ms. White, her family had dinner with her boyfriend's family and agreed that she would be able to return to school.

The victim testified that she kept a journal in which she recorded some of the allegations that she told other people. However, she clarified that she "had gone back and written those in." She kept the journal from the ages of thirteen to sixteen, or from the eighth to the tenth grade. She elaborated that she had a "rough draft journal and a final draft journal." The rough draft journal had "all [her] sloppy writing and all of [her] little side notes. And there were pages between them." She later rewrote the journal to look nice so she could give it to her children one day. She claimed that her friends wanted to read her journal, so she "slipped in stuff from [her] stories . . . so it would seem more believable."

The victim read a journal entry dated April 6, 2010, in which she noted that one of her boyfriends "was confronting my dad about the molestation thing. I tried to tell [him] that my dad is a good and honest man; he's confused. He's just ignored me of course." She then read another entry that read: "The [D]epartment of Child Services showed up to talk to me at school. Family isn't in trouble but they will document their visit with the family. We didn't tell them any of the things they would

- 4 -

consider indecent." The victim then read another post, dated May 14, 2010, that read:

> DCS is coming to see me at school again today. Apparently either "Jade" or Principal Bob are sending letters to them about dad so they have to interview us again . . . but they believe we are innocent. Mom's getting pissed. She says it's harassment so she's going to try to sue Principal Bob for his job if this keeps happening.

The victim testified that after she was caught performing oral sex on her boyfriend at school, she and her boyfriend were taken to the principal's office and given three days suspension each. She recalled that the [petitioner] was "incredibly pissed off." Although the victim was only suspended for three days, the [petitioner] kept her out of school for five days. During that time, the victim had to stay in her room, and "every morning . . . [the [petitioner] would . . . beat the crap out of [her]." He made her hold onto a bedpost while he beat her with a belt. He told her that he would smack her hand if she let go of the bedpost. He called her "white trash" and said that she "would never amount to anything." The victim sustained bruises from her mid-back to her knees from the beating. After the beatings, the victim went into the bathroom while the [petitioner] showered, and they talked. She recalled that the [petitioner] talked about "how he was going to kill [her boyfriend] and [her boyfriend]'s dad, and the usual, just he was pissed." When the victim was hungry and asked for food, the [petitioner] gave her bread, peanut butter and water, which was the only food she had for several days. As a chore, for punishment, she had to carry cinderblocks or logs back and forth across the yard. She understood that she was being punished because she "had given [her] boyfriend a blow job and that is not what Christian girls do."

After the five days had passed, the [petitioner] allowed the victim to return to school, as well as to church and see her youth leader, Jenny White. The victim told Ms. White that her father had locked her in her room for five days and beaten her every day. She also told Ms. White the same things that she had told her friends about the [petitioner's] molesting her when she was being homeschooled in the eighth grade. The victim admitted that she detailed to Ms. White that the [petitioner] had taken showers with her, touched her private areas, and pressed his penis against her body. She admitted that she additionally told Ms. White that the [petitioner] had made her sleep naked with him and touched her on several

- 5 -

occasions when that happened. After the victim talked to Ms. White, Ms. White told her that she was legally obligated to report the [petitioner's] conduct. The victim admitted that she never recanted her story to Ms. White.

Following the disclosure to Ms. White, the victim spoke with a detective and told him the same things she had told Ms. White. She agreed to make a controlled phone call to the [petitioner] because the detective told her that "[i]t would help with the case and with removing [her] from the house." The victim recalled that she later participated in a forensic interview, which was audio and video recorded. She also testified in juvenile court on July 11, 2011, and February 21, 2012.

The victim then read a journal entry from April 12, 2011, in which she said:

> [The petitioner] just burst in my room and said I can never kiss him again or even come within an arm's reach of him. And he said that if [my boyfriend] comes anywhere near me or comes anywhere near he will castrate him and shove [my boyfriend]'s nuts down his dad's father's throat. It just [sic] me off because he threatened [my boyfriend] and [his father]. I have a lot of respect for [my boyfriend]'s family so it's like he threatened my own family when he said that.

> Then [the petitioner] went on a rant about different ways to kill [my boyfriend]. One of them was [he] could drive a sword through his stomach, pull upwards to his chest and then let go of the sword. [My boyfriend] would take a sharp last breath and the pulling of air into his lungs would pull the sword deeper into his body. [He] would watch the life leave his eyes and pull the sword back out of his chest.

The victim read another excerpt from her journal, dated April 26, 2011, in which she noted that the [petitioner] had become more protective of her since "he pulled [her] out of eight[h] grade for cutting" but that "he did a lot of things that tour [sic] us apart." The excerpt further noted that she realized her mother and father "blame[d] it on [her], but if they had just let [her] get through the phase on [her] own or if [the petitioner] had not molested [her] then [she] would be normal."

- 6 -

Another journal excerpt from April 26, 2011, read:

> So today when I was in the car with Jenny [White] she asked me how things are at home. A voice in the back of my head just started to shout that I needed to tell her everything. I was pretty calm about it, that comes with having told the story ten times I guess. After I finished telling her everything; she pulled up to the youth group parking lot and told me that she was legally obligated to call DCS.
>
> She asked to talk to Pastor Todd about it first and find out what's going to happen. She will talk to me before she does anything because I have questions and requests. I don't know whenever someone says abuse, I always think broken bones and rape, not this stuff. I wouldn't have told her, but I don't want [my sister] to go through the same stuff.
>
> I can deal [with] two more years of it, but I don't want her to experience it. She will hate me for taking mom and dad away, but I hope when she's older that she will forgive me.
>
> Mom always said that my first concern should be to protect the family. I tried to keep us together. I have lied to government officials and I hid secrets for four years.

At trial, the victim claimed that the events of which she told Ms. White did not occur.

The victim testified that after her allegations came out, she was placed in the home of an acquaintance from church. She also saw a sex therapist, Shana Frank, at the Nashville Children's Alliance for about a year. During the course of her therapy, the victim never told Ms. Frank that the abuse did not happen. The victim talked to Ms. Frank about the fact that her mother continued to allow the [petitioner] to have contact with her after learning that he was sexually molesting her in the eighth grade. She said that her mother had "good intentions for everything" that happened after the incident between the victim and her boyfriend, explaining that her mother said the [petitioner] "was blowing off steam" during the time he beat her and kept her in her room. However, the victim told Ms. Frank that

she wanted to resume a relationship with her mother. The victim stated that she felt extremely guilty about her parents being in court and acknowledged that both of her parents had told her that the problems in their family were her fault.

The victim testified that shortly after she turned eighteen, she returned to live with her mother. The victim admitted that she met with the prosecutor and said that she was concerned about her mother, but she knew that her father had to have some accountability for what he did.

The victim acknowledged having previously told a forensic examiner and testifying at juvenile court on two occasions that the [petitioner] had committed sexual acts on her, starting at the age of twelve or thirteen. Among those actions, the victim had said that the [petitioner] got in the shower with her about every other day "to conserve water and to rebuild the tender bond that [they] had from when [she] w[as] a young child." She acknowledged previously stating that when the [petitioner] got in the shower with her, he would grab her breasts, "feel her up," and have erections. She acknowledged stating that the [petitioner] would hug her and that she would feel his erection against her. She said that on one occasion, the [petitioner] had pre-ejaculate on his penis, which he said never happened with the victim's mother. She acknowledged previously stating that, after the showers, she would take "naked naps" with the [petitioner]. She said that they would "spoon" during those naps, which the [petitioner] called "making love notes by intertwining [their] legs together" and that he would usually fall asleep with his hand on her breast. However, the victim denied that any of those statements were true.

The victim further acknowledged having previously stated, but now said that it was untrue, that the [petitioner] often got erections during their naps together. She also admitted previously stating, but that it was untrue, that, during one naked nap, the [petitioner] woke up with an erection, got on top of her, touched her private area to see "if it was wet and said . . . you're horny too." She had also said that during that same incident, the [petitioner] moved his hand around and made grunting noises, for which he apologized, but that was also untrue. Another statement the victim admitted previously making but now said was untrue was that on a couple of occasions, the [petitioner] filled the bathtub with water and had her lay on top of him, after which he started thrusting or "humping" his penis against her body.

The victim testified that it was true that the [petitioner] checked her hymen on one occasion during her eighth grade year when she was being homeschooled. She elaborated that she had to have a kidney removed when she was three years old, and she and the [petitioner] were concerned that the surgery had taken her virginity. She explained:

> One of the surgeries they couldn't [get] all of the surgical tools up my vagina so they had to make a little incision in my hymen to fit everything in there. And that's always been something that's kind of been a concern. I never knew it happened until dad mentioned it one day.
>
> And so I was always really worried about it because virginity is a really big deal in our house. And so we looked. We decided to figure out what was going on because I can't see with a mirror. I didn't know what I was looking for.

The victim stated that she lay on the bed, held "everything open," and the [petitioner] "checked real quick." The [petitioner] determined that "it was still intact." The [petitioner] told her that "[t]here was just like a little V cut [out] of it or something, and that it would hurt whenever I lost my virginity." The victim recalled that the incident was "really awkward and uncomfortable." The [petitioner] also later told her that she "had a lot of vagina" and asked whether she was a hermaphrodite. The victim denied that the [petitioner] touched her vagina and moved his hand around until she told him that it was uncomfortable. She explained that, instead, she spread her genitals apart for the [petitioner] to look. The victim admitted that the [petitioner] told her not to tell her mother or other people about his playfully grabbing her breasts or checking her hymen because people would think it was sexual abuse. The victim acknowledged that the [petitioner's] action of checking her hymen was inappropriate and "really weird," but she claimed "there was nothing sexual about it."

The victim admitted that the [petitioner] discussed his and her mother's sex life and told her about her mother's fetishes. The [petitioner] told the victim that she "stressed him out," which caused his blood pressure to rise such that he had to be on medication. According to the victim, one of the [petitioner's] medications caused him to easily get erections. However, the victim stated that the [petitioner] told her that his erections with her caused him to have problems getting erections with her mother.

- 9 -

She acknowledged that the [petitioner] said that he did not have sex with his wife because of her. The victim elaborated:

> [W]hat I know is that I was stressing dad out and he had blood pressure problems. And he got on Cialis and he was still having problems having sex with mom. But when he was around the house just hanging out and I was at the house, it would happen.
> The victim denied ever seeing the [petitioner] with an erection despite having previously said that she had.

The victim testified that the [petitioner] came to school to have lunch with her once or twice a week and people started spreading rumors about them. One rumor was that she "was making out with [her] dad on the back of a motorcycle." Thereafter, the [petitioner] stopping (sic) visiting her for lunch so often.

The victim acknowledged telling prosecutors on the morning of the trial that the [petitioner] had touched her inappropriately. She discussed with the prosecutors how the [petitioner] had showered with her and touched her breasts and buttocks in the shower. She also discussed that the [petitioner] got erections. She referred to the [petitioner's] having pre-ejaculate on his penis and stated that she had asked him about it. The [petitioner] told her that he did not know what it was because he had never experienced it with the victim's mother. The victim told prosecutors that the [petitioner] masturbated in the shower when she was in the room. One time, the [petitioner] filled the bathtub with water and made the victim lie on top of him while he had an erection. The victim discussed taking "naked naps" with the [petitioner] and his touching her breasts and buttocks. She explained that the [petitioner] "spooned" her in bed, that his penis came in contact with her, and that he sometimes got erections. The victim discussed with the prosecutor a particularly upsetting incident when she woke up and the [petitioner] had an erection. She elaborated that "things got out of hand," and the [petitioner] got on top of her and "started feeling [her] up." He asked her "if [she] was wet," and she rolled out from underneath him, told him to stop, and left the room. She told the prosecutors that she and the [petitioner] later talked about it, and he apologized.

The victim acknowledged that, during her conversation with the prosecutor right before the trial, she asked the prosecutor how long of a

sentence the [petitioner] faced. Asked why she did not recant then, the victim responded, "Because everybody has an agenda. And . . . I'm just . . . tired of having a bunch of attorneys tell me what to do[.]" She stated that she did not want the guilt of having her father "go to jail when he didn't do most of the stuff." However, she stated that "[t]here is some stuff he did do that was really wrong, but I'm not going to keep making lies." She acknowledged that the prosecutor did not ask her to embellish the truth.

The victim testified that, even though she told several people about numerous allegations of molestation, even as recently as the morning of trial, the stories were all fabricated. The victim admitted that, in sum, she had told the guidance counsel at NSA, a DCS worker, a forensic interviewer, and an attorney from the district attorney's office that the [petitioner] molested her. She explained that her testimony was different now because she was an adult and understood that there were consequences for lying under oath. The victim admitted that she was having trouble testifying, explaining, "Like I'm trying to split out which parts actually happened and which parts didn't."

Robert Wilson, former principal of NSA, testified that the victim began attending the school in the ninth grade. Prior to attending NSA, the victim attended Two Rivers Middle School, but there was a one-year gap between her attendance at the two schools and nothing in her record to indicate that she was being homeschooled that year. However, the victim passed the tests to be admitted to NSA.

Mr. Wilson testified that sometime during the 2009-2010 school year, he observed some behavior between the victim and the [petitioner] that concerned him. On one occasion, he observed the [petitioner] and the victim leaning against a door together and walking hand-in-hand to the cafeteria. Mr. Wilson followed them and saw them sit in two chairs at the far end of the cafeteria. The victim had her bare feet in the [petitioner's] lap, and he was playing with her toes. Mr. Wilson noted that he had never seen a parent and child interact in such a manner. Mr. Wilson also noted that the [petitioner] was wearing a tank top, which was not proper school attire for students. Therefore, he spoke with the [petitioner] and asked him not to wear tank tops to the school.

Mr. Wilson testified that the [petitioner] called and left him a message stating that he was concerned about what some students were saying about his relationship with the victim. The [petitioner] asked if Mr.

Wilson could provide a private place where he and the victim could have lunch together. Mr. Wilson returned the [petitioner's] call and told him that he could not provide a private lunch spot and that if he was concerned about the rumors, "he probably shouldn't come around so much." Within weeks of that conversation, Mr. Wilson observed the [petitioner] and the victim having lunch in the teacher's lounge. He informed them that they did not have permission to be in the teacher's lounge and that they needed to leave. Mr. Wilson stated that, as an educator, he had mandatory reporting obligations regarding suspected child abuse, and he made a referral regarding the victim in April 2011. Mr. Wilson acknowledged that he never saw any acts of molestation or sexual abuse of the victim by the [petitioner].

Jenny White testified that, in the spring of 2011, she was a youth pastor at Friendship Community Church. The victim's family attended church there, and the victim and her sister attended the mid-week youth group meetings. At some point, Ms. White began giving the victim a ride to church because they lived in the same neighborhood.

Prior to April 2011, the victim shared with Ms. White some "questionable" things about her family that caused Ms. White to inform the victim that she might have to disclose that information to others if the victim continued to share information. This included the [petitioner's] having seen the victim in the shower. Additionally, Ms. White had observed "a lot of physical touching between a father and daughter, a lot. Back rubs, a lot of hugging, kissing on the mouth, that sort of thing that is strange just enough that it would put up a red flag[.]" Then, in April 2011, the victim disclosed to her some information, and Ms. White told her that she would have to disclose that information if they kept talking. The victim was okay with Ms. White disclosing the information and continued to talk to her. Ms. White got the impression from the victim that she did not want to be in the home and "didn't want her sister there either for protection purposes[.]" With the victim's permission, Ms. White called the victim's school and spoke to the principal and guidance counselor. The three of them decided that they needed to make a referral to DCS.

After the referral, Ms. White continued to pick up the victim for youth group meetings. Ms. White assisted law enforcement and DCS in facilitating a meeting with the victim before they spoke to her family. Ms. White picked up the victim for youth group, and officers and DCS spoke to her at church. During that meeting, the victim made a phone call to the

[petitioner]. Thereafter, officers asked Ms. White to drive the victim home but had an officer meet them at the house. Ms. White recalled that the victim "was super nervous and was crying." The victim went to stay with another family in the neighborhood. Ms. White continued to take the victim to youth group until the victim eventually began going to another church. The victim never recanted her story to Ms. White.

The victim's former boyfriend testified that he was a graduate of NSA and had dated the victim from his sophomore to his senior year. He described that their relationship "started out a little iffy and then [they] got to become better friends and then towards the end it got a little untrusted[.]" With the exception of the times at the beginning and the end of their relationship, he and the victim were close, "[b]est friends pretty much. We would talk about anything."

The victim's former boyfriend said that, during their sophomore year, he and the victim got into trouble at school and were suspended. At the time of their suspension, he and the victim were very close. They communicated with each other through Facebook messages during the suspension. The victim told him that the [petitioner] had beaten her. He could tell that the victim appeared to be sad and upset. He was out of school for three days, and the victim returned to school the following week. The victim told him that she wanted to return to school to get away from the house for a while. Just prior to the victim's returning to school, he and his parents had dinner with the victim and her parents.

Prior to the suspension, the victim had indicated to her boyfriend that the [petitioner] had sexually abused her. He was aware that the victim kept journals. A couple of weeks prior to the suspension, the victim asked him to keep one of her journals. Around the time of the suspension, the victim asked him to keep a second journal. He later gave the journals to the police.

Officer Edmond Strickling with the Metro Nashville Police Department's Sex Crimes Unit testified that, in April 2011, he received a referral from DCS and began investigating the alleged sexual abuse of the victim by the [petitioner]. Officer Strickling met with the victim at a church and conducted a detailed interview with her. During the interview, the victim made a controlled phone call to the [petitioner] which was recorded.

- 13 -

During the call, the victim referred to a Bible verse and asked the [petitioner] if they were going to go to hell because they were "sinful people from the stuff [they] did." She stated, "Because I mean we saw each other naked just like it says in the verse[.]" The [petitioner] responded, "I changed your diapers. I saw you naked when you were two. True, things changed, furniture moved, things developed, and it's true that, uh, we did take some liberties that might have been questionable." The [petitioner] then noted that privacy in their household had never been "all that great." The [petitioner] looked up the Bible verse to which the victim had referred and stated that it was talking about brothers and sisters committing incest. The victim asked about taking showers together and "naked naps." The [petitioner] then questioned whether the victim was alone, and she responded affirmatively. The [petitioner] answered, "[W]e didn't have sex.. . . I didn't do anything with the intent of sexual gratification." The victim again asked whether they would go to hell because of the naked naps and the showers, and the [petitioner] stated that he had asked for her forgiveness and "[i]f there was a sin there, it was [his] not [hers]." He then said that he had repented and asked for God's forgiveness, and again that he had asked for her forgiveness "for the times it may have gone a bit far."

The [petitioner] stated that "there were a lot of reasons that seemed to make sense . . . at the time . . . when it was done." He continued, "I backed away from you . . . as you began to develop because I didn't know what to do with it.. . . And I was a little bit panicked about it." He then told the victim, "[Y]ou were starting to throw off pheromones that were making my body respond in ways that were extremely embarrassing to me." He stated that he went to a therapist but stopped going because the therapist suggested that his actions were sexual abuse. He noted that "from a certain point of view, [the therapist] may have had a point." The [petitioner] stated that, as the victim got older, he needed to reestablish the bond that he had with her as a child. He stated, "I felt the strongest bond to you as a child was when I'd lay on the couch and lay you on my chest and you'd sleep on my chest.. . . That was skin to skin." The [petitioner] claimed that the "naked naps" were to try to bond with the victim again. The [petitioner] said that he was "trying so hard to control what was happening down there" when he was around the victim that he was experiencing trouble having sex with his wife.

The victim referred to the [petitioner's] touching her, and he responded, "I guess, I did." He elaborated, "I examined your hymen twice because I was trying to learn about it and trying to figure out what to do

- 14 -

about yours. Um, but I never touched your clitoris. I never tried to arouse you. Did I?" The victim responded that he did, and the [petitioner] apologized. The victim told the [petitioner], "There was one time when you woke up from the nap, and you had [an erection] and you - it got scary, and that's when I jumped out of the bed, and you came out ten minutes later and apologized." The [petitioner] said he remembered that incident and "that was what [he] was asking for forgiveness for. That was . . . off the charts, and that was wrong." He explained that he was waking up and "trying to deal with [her] pheromones, and [he] really didn't have a handle on it at the time, and . . . it went too far."

The [petitioner] said that he thought he needed to educate the victim about sex. He noted that "privacy was already . . . lost in this house anyway" and he "always kind of had a slight nudist vent anyway," but "[t]he biggest problem was that [he] kept getting [erections] anytime [he] was around [her]." Toward the end of the conversation, the [petitioner] stated that "there w[as] at least one occasion where it went entirely too far. Um, I did examine your hymen." He elaborated that he thought the doctor who performed surgery on her when she was toddler had "took her virginity."

After the call, Officer Strickling went to the [petitioner's] home and confronted him about the allegations of sexual abuse. Officer Strickling audio-recorded his conversation with the [petitioner]. The [petitioner] denied the allegations of sexual abuse. Officer Strickling later spoke to [the victim's former boyfriend] and his parents. [The victim's former boyfriend] provided Officer Strickling with the victim's journals that he had in his possession.

*Darrell Dean Hochhalter*, 2015 WL 4556917, at \*1-9. Upon our review, this Court upheld the petitioner's convictions and the rulings of the trial court.

The petitioner filed a timely petition for post-conviction relief on October 4, 2016. In the petition, the petitioner alleged numerous reasons as to why he received ineffective assistance of counsel at trial where he was represented by local counsel and counsel from out of state.[1] Primarily, the petitioner alleged trial counsel were ineffective in their handling of the admission of evidence concerning the victim's prior inconsistent statements, including her forensic interview, her journals, and her testimony during two

---

[1]We will refer to the petitioner's trial counsel from Tennessee as "local counsel" and his counsel from New York as "lead counsel."

juvenile neglect proceedings.  The petitioner also challenged trial counsel's handling of the jury instructions applicable to the same.  Further, the petitioner argued trial counsel failed to: "object to testimony of Jenny White concerning hearsay statements attributed to [the victim];" file a "comprehensive motion for a bill of particulars and to pursue an adequate response by the State;" "examine the State's evidence prior to trial;" "effectively interview and consult with [the petitioner];" "verify trial date and resulting loss of the jury consultant;" and "object at sentencing to the absence of [a] sexual evaluation as part of the presentence report as required under Tenn[essee] Code Ann[otated] § 39-13-705(a) before the trial court rendered its sentence."  Finally, the petitioner alleged "[t]he cumulative effect of the errors by trial counsel denied the [p]etitioner his constitutional rights to effective assistance of counsel, due process, the right to present a defense, and the right to confrontation of his accuser as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Tennessee Constitution."

At the post-conviction hearing, lead counsel stated a jury consultant referred the petitioner's case to him and he accepted the same.  At the time, lead counsel practiced in New York but met with the petitioner prior to trial both in person and over the phone.  Lead counsel acknowledged the original trial date was changed and as a result, the jury consultant hired by the petitioner was no longer available to attend trial.

Lead counsel asserted he "fully discussed the case with [the petitioner]."  Though he could not remember how many trips he made to Tennessee, lead counsel appeared in court for the petitioner and reviewed discovery with the petitioner prior to trial.  Lead counsel and the petitioner discussed "all of the circumstances of the case," and lead counsel "got full explanations of everything."  He "spoke to [the petitioner] in the presence of [the petitioner's] wife, and [lead counsel] went over the case in detail."  He answered the petitioner's questions and believed the petitioner understood the issues and evidence in the case.  Lead counsel also discussed a plea bargain with the petitioner and stated, "I would never try a case where the [petitioner] wasn't completely involved in it."

Lead counsel then addressed specific issues that emerged during trial after the victim recanted her allegations of abuse.  Before trial began, lead counsel was aware the victim "made prior statements," and he discussed the same with the petitioner and local counsel.  He "remember[ed] discussing specifically the fact that [the victim] . . . was going to deny that [the petitioner] did anything."  He explained his resulting trial strategy, as follows:

> I put forth in front of the jury the fact that there were circumstances that lead (sic) [the victim] to say the things that she said.  And obviously that argument didn't work, but I believe that there was a motive on the

[victim's] part at that time to say those things. And there were circumstances that I was able to argue to the jury.

Lead counsel considered the victim's prior statements to be recent fabrications rather than inconsistent statements, and he deferred to the record regarding his cross-examination of the victim about the same. Additionally, lead counsel explained he "let . . . local counsel object on all of the issues in the case," which included objecting to the victim's prior statements.

Regarding the victim's journals, lead counsel believed he "had" them prior to trial but he was not sure. He remembered local counsel objecting to the admissibility of the victim's journals, noting "You know, I think [local counsel] objected to it. And I went along with it, but the judge ruled the other way. And I personally I -- on reflection, I can see why he did." Regarding the admission of the victim's forensic interview at trial, lead counsel again stated he "didn't do the objection." After discussing the issue with local counsel, however, they agreed on a strategy wherein "it was better for the [victim] to come in and deny that it happened. And I think there were many motives that were brought out before the jury why she did that." Lead counsel did not recall the evidentiary issues surrounding the admissibility of the victim's testimony from a juvenile neglect hearing.

During cross-examination, lead counsel stated he appeared on behalf of the petitioner at least once prior to trial though he did not remember if he attended a May 3, 2013 hearing on a motion to continue the petitioner's trial, and he did not remember sending a letter about a conflict in his schedule regarding the same. Lead counsel confirmed he cross-examined all witnesses during trial but deferred to local counsel regarding all evidentiary objections though he did "look[] over the Tennessee rules" prior to trial. Lead counsel did not remember when the forensic interview or juvenile neglect hearings occurred. He did not recall objecting to the entry of the victim's journals or going to the property room to review them before trial but acknowledged the record reflected that he had not reviewed all of the journal entries prior to trial. Lead counsel did not remember the dates of the journal entries, the substance of the journal entries read into the record at trial, and only "[v]aguely remember[ed]" the victim's boyfriend had possession of the journals before turning them over to the State. He again stated local counsel handled the objections concerning the entry of the journal entries as substantive evidence at trial.

Lead counsel classified the particular facts of the case, wherein the victim recanted the accusations against the petitioner, "as a little rare" and also acknowledged it was "unusual" for the State to use prior inconsistent statements to impeach the victim during trial. Lead counsel did not file any pre-trial motions to exclude the victim's prior

statements, and he did not recall whether he considered filing a pre-trial motion to exclude the journal entries.

Local counsel testified he was retained by the petitioner prior to trial. However, after he urged the petitioner to take a plea deal, the petitioner hired lead counsel who took over the case. Prior to lead counsel's hiring, local counsel represented the petitioner during "a full dependant/neglect trial." As such, local counsel "was well aware of all of the facts and had pretty much prepared the trial except for the last minute stuff you do before [lead counsel] came in."

Local and lead counsel maintained a "cordial" relationship as they prepared for trial. The two "had telephone conferences" and had "an in-depth conversation" wherein they discussed "the evidence, the problems in this case, what the theory would be," and "whether or not the victim was going to testify." Prior to trial, local counsel "didn't have a real clear certainty in my mind at that point whether [the victim] was going to deny or not" whereas lead counsel "felt [the victim] was going to deny" her allegations during her testimony.

During trial, local counsel handled all objections, but pre-trial motions and strategy ultimately fell to lead counsel. Local counsel stated no pre-trial motions were filed to challenge the State's evidence, including the victim's journals, the victim's forensic interview, the victim's testimony from the neglect hearing, Mr. Wilson's testimony, or Ms. White's testimony. He did not recall the testimony of Mr. Wilson or Ms. White or his objection, or lack thereof, to the same during trial. Local counsel admitted he did not object to the introduction of the victim's testimony from the neglect hearing into evidence.

Regarding the victim's journals and counsel's review of the same, local counsel stated he had "at least what [he] believed was probably the most damaging portions" of the journal entries prior to trial. He disagreed with lead counsel's testimony on this issue, stating "I don't remember what we didn't get, if anything, before trial or by trial." However, local counsel also did not "have a memory of going down and looking at [the journals], so if I said I did not, then I did not." He acknowledged the record reflected that lead counsel made a motion during trial to exclude the victim's journals. Regarding the "crucial" nature of the victim's journals, local counsel stated "I can't give a simple yes or no answer to that because it depends on what -- how you are defining crucial. Could they have won the case without them, yes.. . . It did strengthen their case."

Local counsel filed a motion for new trial on behalf of the petitioner, a copy of which was entered into evidence. Within the motion, local counsel did not address lead counsel's motion to exclude the victim's journals as a discovery violation during trial. In

reviewing this Court's opinion on direct appeal as to local counsel's objection to the admissibility of the victim's forensic interview during trial, local counsel acknowledged this Court stated he should have objected to the introduction of the evidence as cumulative rather than as a violation of the confrontation clause. Local counsel, however, maintained his objection was "legitimate."

During cross-examination, local counsel stated he met with the petitioner numerous times, noting the petitioner "was one of those clients that was more active than most. He would call routinely, he would stop into the office. We had a lot of communication." Local counsel was comfortable with the petitioner's understanding of the case, but "was not comfortable with [the petitioner's] understanding of [how] damaging certain pieces of evidence were and we had in my view little to no chan[c]e to win." Despite local counsel's advice, the petitioner chose to go to trial.

Local counsel again clarified he "was barred as lead counsel well before the trial." As such, he did not prepare any pre-trial motions regarding the possible recantation of the victim because he was unsure if the victim would recant at all. Rather, when the victim recanted at trial, local counsel began considering how to combat the prior inconsistent statements and strategically chose to avoid repeating the victim's prior statements by not repeatedly objecting or requesting limiting instructions regarding the same. According to local counsel, "it just wasn't going to change the landscape. It was not going to change the fact that the jury heard these statements. It was just going to draw more attention to them."

However, local counsel did object to the introduction of the victim's forensic interview. When the trial court ruled against the objection, he and lead counsel decided the best course of action would be to play the entire interview, rather than only playing portions of it. Local counsel explained their strategy, as follows:

> Because we -- and I can't refer to the specific statements five years later because I haven't reviewed the entire case, I haven't reviewed the forensic interview. But I do have a clear memory of just talking over with [lead counsel] and making the clear decision in my mind that if the State was pulling out the damaging parts of the forensic interview. We felt that there were parts of the forensic interview that were -- if not outright helpful, just put somethings (sic) in more context. Because again, five years later and without having looked at the forensic interview, I don't recall if it was her demeanor and attitude that she had against her father or whether she made specific statements to -- that mitigated or made it -- I don't recall what it was. But I certainly felt that it was better for the defense to have --

if the bad parts of the interview were coming in, that the rest needed to come in because it -- I felt that was going to help us.

Local counsel did not recall any discussions about requesting limiting jury instructions as to the victim's forensic interview, her testimony from the neglect hearings, or her journals. He explained:

And I think I probably in thinking about it, probably for half a minute thought about asking for a special instruction so that, you know, maybe if that would have not come in, we could have moved for a judgment of acquittal because if she recanted, and then there is no other evidence could we move for a judgment of acquittal.

But you know, as has not been discussed here yet, when that controlled phone call was made with [the petitioner]. I mean, that was definitely coming in. And that was clearly enough for [the] State to overcome a judgment of acquittal, so I just didn't see any upside to either objecting or asking for special instructions.

Now, would it have been maybe better or perfect practice for one of us, [lead counsel] or myself, to file some pretrial motions to try to whittle these other statements down, probably. But given the total landscape with all of the evidence, I don't think it would have made a difference in the verdict.

Local counsel did not dispute the motion to continue but also could not provide additional details surrounding the reason behind the same. He recalled having to "track down [lead counsel]" during the motion hearing and noted the case was ultimately continued. Finally, local counsel did not remember anything concerning the absence of a sexual evaluation in the presentence report of the petitioner.

During redirect examination, local counsel explained he had approximately "48 hours notice that [the victim] was probably going to recant. So I had that much time to think about it at least." Local counsel admitted he did not consider the prior inconsistent statements' inadmissibility under Tennessee Rules of Evidence Rule 613(b) as cumulative, extrinsic evidence after the victim admitted to making the prior statements during trial. Local counsel stated he did not

have a specific memory of [the victim] testifying and saying, yes, I said this to this person or that to that person. I'm confident it happened just

from my general recollection about the case, but I don't remember what she said as to each prior statement as far as admitting that she made that.

The petitioner then testified, stating he hired a jury consultant after local counsel expressed "he didn't believe he could convince a jury" and encouraged the petitioner to take a plea bargain. The petitioner then hired lead counsel on the recommendation of the jury consultant and the strength of lead counsel's online resume. Prior to lead counsel joining the defense team, the petitioner and local counsel went over the charges, but the petitioner stated they did not really discuss "the facts behind them." Though the petitioner no longer trusted local counsel prior to trial, he remained on the case with lead counsel. The petitioner met with lead counsel twice, "[t]he day that we were supposed to have a trial and didn't, and then the day when the trial actually happened." The petitioner explained on the original trial date, he flew family in from Texas and Colorado, flew the jury consultant in from California, and flew lead counsel in from New York. However, the case did not go to trial that date, but the petitioner was "not entirely sure" why. As a result, the jury consultant was not able to make the new trial date and the petitioner only had his wife, lead counsel, and local counsel with him during the same.

Before trial began, the petitioner learned the victim might recant her allegations against him. According to the petitioner, the victim tried to approach him at church but he did not engage with her. Instead, the victim got lead counsel's telephone number from the petitioner's aunt and contacted lead counsel herself. The petitioner, however, did not know when lead counsel learned the victim would likely recant at trial, noting the issue "really wasn't discussed with [him]." The petitioner and lead counsel discussed the victim's potential recantation "[n]ot in specific terms, only in generalities of if this happened, if that happened, that is as far as that went."

The petitioner and lead counsel had "[n]umerous phone calls," and the petitioner provided lead counsel with "everything [he] had" in support of his defense. The two also discussed whether the petitioner should testify or not at trial. The petitioner stated lead counsel "said that [local counsel] recommended that I not [testify] and [lead counsel] was going to stick with what [local counsel] said, and he said no." The petitioner and lead counsel did not discuss anything further in regards to his decision, and the petitioner stated neither local nor lead counsel would discuss "what kind of questions to expect if he did" testify or provide "instructions on how to testify." The petitioner acknowledged his participation in a colloquy during trial wherein he stated it was his decision not to testify. The petitioner stated his trial testimony would have helped his case in that:

> I could have explained that phone call. There is a lot of back story behind that that nobody else really offered. I could have explained the relationship with my daughter and what was going on. I could have

- 21 -

explained the moral position of me and my wife as far as my daughter's behavior. Everything that lead (sic) up to that, I could have -- I could have brought a lot to that.

Regarding the victim's journals, the petitioner understood the victim "admitted to having fabricating them and even explained how." To that end, the petitioner stated he found "a stack of blank notebooks and a box of different colored pens" in the victim's room which the petitioner believed to be the materials used by the victim to fabricate her journal entries. He gave local counsel the materials, but they were not presented at trial. Regarding the journals in the State's possession, the petitioner stated local counsel "had maybe four or five pages that were photocopied out, but beyond that" local counsel did not review the content of the journals further.

Finally, the petitioner stated appellate counsel told him he could not amend the motion for new trial because the notice of appeal had already been filed despite local counsel ensuring it could be amended. The petitioner stated local counsel "told me three times that issues that I wanted on that could be amended -- they could be added by the next guy was his quote." The petitioner listed the issues not presented in the motion for new trial, including "[t]he admission of the forensic interview, the journals. I'm trying to remember. There were four or five that I felt should have been added on and [local counsel] just similarly would not add them. He said the next guy would amend it is the word he used was amend." After filing the motion for new trial, local counsel withdrew from the petitioner's case. Lead counsel withdrew prior to the filing of the motion for new trial.

During cross-examination, the petitioner stated he did not travel to New York to meet with lead counsel. Instead, they met when lead counsel traveled to Nashville. The petitioner did not consider the potential difficulty in meeting with an out-of-state attorney prior to trial but noted he talked to lead counsel on the telephone "[n]umerous times." The petitioner told lead counsel "[a]s much as [he] knew" about the charges against him despite not having "a list with details on it" as requested by lead counsel.

The petitioner further addressed the evidence produced against him at trial. He believed the substance of the juvenile court hearings were "general mostly" and, in his opinion, "lies." The petitioner acknowledged the recorded telephone call between him and the victim was discussed during the juvenile neglect hearings which addressed the victim's accusations that the petitioner touched her breasts and buttocks, took naked naps and showers with the victim, checked the victim's virginity by touching her vagina, and touched the victim's vagina while having an erection. As such, the petitioner admitted he was aware of the victim's specific allegations of abuse but stated he "knew it wasn't true." The petitioner sent lead counsel transcripts of the juvenile neglect hearings after

which they had "lots" of discussions about the same, and the petitioner provided lead counsel with his version of the story. The petitioner was comfortable lead counsel understood his position regarding the allegations and the evidence in the case prior to trial. "More important to [the petitioner] was that [lead counsel] believed [him]." The petitioner stated he communicated with counsel during trial, heard the victim recant, and chose not to testify.

On the Friday before trial, the petitioner met with lead counsel at his hotel in Nashville. The petitioner began "to have some doubts" about lead counsel because "[h]e said he didn't remember a lot of stuff, . . . and eventually he chased me out of the room." The petitioner relayed his insecurities about lead counsel to his wife, not local counsel. The petitioner repeated, "I did not trust [local counsel] one bit by that time." The petitioner did not inform the trial court about his issues with counsel, explaining:

> Ma'am, I'm not a lawyer, I don't know what I could have done at that point. The trial was here, I had [local counsel] I didn't trust; I had [lead counsel] that I was beginning to have doubts about. What was I supposed to do? . . . They had already postponed this numerous times because I was trying to get counsel together. I really didn't expect them to say well, okay, let's go ahead and put this off another year.

The petitioner did not remember the terms of the plea offer but stated "I didn't want to plead guilty to something that I had not done."

During redirect examination, the petitioner stated lead counsel did not ask the petitioner to come to New York to discuss the case prior to trial and lead counsel did not review the juvenile neglect transcripts with him prior to trial. The petitioner believed he provided counsel with all of the information he could about the evidence against him, but he did not know counsel failed to review the entirety of the victim's journals. Throughout the trial, the petitioner became concerned that lead counsel was suffering from "[m]emory loss." After learning lead counsel's father suffered from dementia, the petitioner "finally went awe, I see. He's having trouble with memory because it runs in his family. I'm not a doctor, so I can't back that up. That's just a connection that I made that kind of helped explain why he was as forgetful as he was." The petitioner stated he learned through his direct appeal that counsel made the incorrect objection regarding the admissibility of the forensic interview at trial.

Finally, at the request of the post-conviction court, the petitioner provided a description as to how he would have explained his actions with the victim had he testified at trial:

[The post-conviction court]: And just so I can try to evaluate as the law requires me to, you raised about wishing you had testified but they didn't prepare you and didn't do anything, and I don't know exactly what the record says about all of that hearing at the time, but just so I can get a general understanding of how that decision not to testify might compare to what you would have told the jury. Because you said earlier that you would have testified and explained a phone call and what your daughter had said at juvenile, so my question is this: How would you have explained and knowing that you would have been cross-examined by the State about all of this? The phone call discusses your statement of, at times it went a bit too far, you talk about naked naps. You talk about every time you were around her, I'm using your words, hard-ons.

. . .

And you couldn't help it. You checking her hymen multiple times and it had a little nick in it. And that her vagina, using your words again, was a little big, just generally -- and that's just a few of the things, what would you have told the jury about all of that?

[The petitioner]: First of all, she made two very disturbing accusations.

[The post-conviction court]: I'm talking about, these are your statements.

[The petitioner]: Right. Right. Hold on.

[The post-conviction court]: Okay.

[The petitioner]: And having made those accusations didn't make any sense, they were confusing. I didn't understand what she was saying, so I recounted the three most embarrassing events and all of the three embarrassing events that could have possibly come to those kind of events and none of them contained it. And I have talk to her previously about these things. Nothing that I said to her wasn't what I had said before. And they were all fabricated to manipulate my daughter.

[The post-conviction court]: I'm not talking about any fabrication, I'm talking about your statements.

[The petitioner]: Yes, sir. Yes, sir. Parents -- parents –

[The post-conviction court]: You would have been asked by the State, what did you mean, [], when you said on the phone conversation that you went a little bit too far? And why did you, [], on the phone call say that you were checking her hymen to see if she was still a virgin?

[The petitioner]: I will tell you what, we will go with the hymen one.

[The post-conviction court]: Okay.

[The petitioner]: Okay. Parents sometimes lie to their children.

[The post-conviction court]: About Santa Clause, yeah, I get that.

[The petitioner]: I had had a very rebellious child. She did not respect my authority or my instruction. She was very flirty, she was -- she behaved in a promiscuous matter.

[The post-conviction court]: The jury over there is already looking kind of suspect on you.

[The petitioner]: Hold on.

[The post-conviction court]: Okay. Go ahead.

[The petitioner]: Anything that I could tell her that would give her that doubt, that moment of hesitation in which she can make a decision not to have sex would be in my opinion a good thing. Me and my wife, we have -- we hold to the purity values. I'm trying to think of a good way to say this that's not -- my wife and I were both virgins when we got married. It's important to us. [The victim] was not getting it. So anything that I could do to give her that hesitation, that moment of pause, anything that I could get her to stop behaving in a way that would make other teenage boys believe she was coming on to them, anything that I could do to prevent that.

[The post-conviction court]: And how does that have to do anything with checking her vagina?

[The petitioner]: Sir, I walked into the room for about three seconds, I looked, I said huh. I left the room, I told her it was thick and beefy and was really going to hurt the first time she had sex. It was really going to hurt a lot and it was going to bleed a lot.

[The post-conviction court]: So –

[The petitioner]: If I was going to try to do that, why would I –

[The post-conviction court]: You checked it.

[The petitioner]: I looked and then I walked out of the room. I was fully clothed I could --

[The post-conviction court]: And the naked naps and the I got an erection every time; what is the jury going to think of that?

[The petitioner]: Well, there was only one. It was an accident, it was a mistake. I work third shift at UPS. I had to get sleep sometimes, I did take naps during the day. It was June, we had a hydration program. I drank a lot of water and I had a problem with erectile disfunction (sic) and I was took some medication that was given to me by a doctor. I didn't expect to wake up with one. It was embarrassing. I was ashamed. I had one.

[The post-conviction court]: So you would have had to acknowledge that you took naked naps with your daughter?

[The petitioner]: I took a nap -- I was, she wasn't. I was under the sheets, she wasn't. I did wake up with an erection. It was embarrassing. I didn't know what to do about it. She left the room, gave me some time to work out what to do about it.

[The post-conviction court]: But then they would ask you about on page three of the phone call what you meant by you agree you took liberties with your daughter that were questionable.

[The petitioner]: When she was cutting -- when I found that she had been cutting and I went into the bathroom and examined her after she got out of shower, that's the naked shower part. She was naked, I wasn't. I saw her.

[The post-conviction court]: So that's what you are talking about it was your sin, not her's (sic)?

[The petitioner]: Yeah, I was not comfortable with it. I didn't feel good about it. I was embarrassed about it. But yeah, I did it.

- 26 -

[The post-conviction court]: And you think that would have been a good thing to express from your perspective to [the] jury?

[The petitioner]: It would have been better than not I'm saying.

. . .

I almost wish you could have a Bible and I could put my hand up here and say I didn't do that.

After its review of the evidence presented, the post-conviction court denied the petition, finding the petitioner failed to carry his burden of proof to show the ineffective assistance of trial counsel. The petitioner timely appealed.

## *Analysis*

On appeal, the petitioner asserts the outcome of his trial would have been different absent the deficiencies of trial counsel. The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that

counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I. The Victim's Prior Statements

The petitioner argues trial counsel were deficient in their handling of the admissibility of the victim's prior statements, including her forensic interview and her testimony from the neglect hearing, at trial. Specifically, the petitioner asserts trial counsel failed to properly object to the introduction of the victim's forensic interview and testimony from the neglect hearing as cumulative evidence under Tennessee Rule of Evidence 613(b). The petitioner also asserts trial counsel erred in conceding the testimony from the neglect hearing was admissible as impeachment evidence. Finally, the petitioner argues trial counsel were deficient by failing to file pretrial motions to limit the introduction of the victim's prior statements. The State contends trial counsel's strategy concerning the victim's prior statements was "appropriate under the circumstances." Upon our review of the record, it is clear the petitioner cannot show

prejudice resulting from trial counsel's handling of the victim's prior statements and he is not entitled to relief.

At the post-conviction hearing, both lead and local counsel testified they engaged in significant communication with the petitioner during which the petitioner provided explanations for his behavior as alleged by the victim. Additionally, trial counsel and the petitioner reviewed the victim's prior statements made in the forensic interview, the neglect hearings, and portions of her journals. After the discussions, trial counsel and the petitioner pursued a trial strategy wherein they would demonstrate the victim's motives in alleging abuse against the petitioner. Though lead counsel and the petitioner suspected the victim might recant her allegations of abuse during trial, local counsel was unsure of the same. As a result, local counsel did not address the victim's potential recantation until it occurred during trial. When the victim recanted and the State introduced the victim's forensic interview into evidence, local counsel objected to the introduction of it. The trial court, however, overruled the objection. The record shows local counsel then made a strategic decision not to draw unnecessary attention to any of the victim's prior statements wherein she accused the petitioner of sexual abuse. To that end, local counsel did not continue to object to or request jury instructions regarding the introduction of the prior statements. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." *Nesbit v. State*, 452 S.W.3d 779, 796 (Tenn. 2014) (citing *Goad*, 938 S.W.2d at 369). Accordingly, the petitioner has failed to demonstrate trial counsel's defense strategy was unreasonable, fell below professional norms, or that it prejudiced the outcome of his case. *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 687, 688; *Baxter*, 523 S.W.2d at 936).

Additionally, the record makes clear the victim alleged sexual abuse against the petitioner, and the petitioner confirmed portions of the same during a controlled telephone call with the victim. At trial, the victim recanted some of her allegations but did not deny making the prior allegations of abuse against the petitioner. The defense attempted to highlight portions of the victim's varying stories in an effort to demonstrate their theory of the case, that the victim was motivated to allege abuse against the petitioner in the past. The jury, however, ultimately rejected the defense theory and nothing in the record suggests the outcome of the petitioner's trial would have been different had trial counsel pursued a different objection to or a limiting jury instruction on the victim's prior statements. *Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief.

II.     Reviewing the Victim's Journals

The petitioner next argues trial counsel failed to fully investigate his case by not reviewing all of the victim's journals prior to trial. The State asserts trial counsel's

investigation into the victim's journals "was satisfactory under the circumstances," and we agree. In reviewing this issue, the post-conviction court determined trial counsel were not deficient in failing to review the entirety of the victim's journals prior to trial because "[u]ntil [the victim] recanted, neither the State nor the defense team expected those journals to be a part of the proof against the [p]etitioner." As such, the post-conviction court found "it is within the range of competency for an attorney preparing for trial to not invest a significant amount of his or her necessarily limited time and energy reviewing voluminous journal entries that neither party expected to contain additional relevant evidence or to be a portion of the State's case against the [p]etitioner." The post-conviction court further held the petitioner failed to show he was prejudiced by trial counsel's failure to review the entirety of the journals because lead counsel "swiftly incorporated many of the new journal entries as supportive of the defense's theory of the case that [the victim] had recently fabricated the allegations."

Upon our review of the issue, we agree with the post-conviction court. At the evidentiary hearing, local counsel stated he reviewed "the most damaging portions" of the victim's journal entries prior to trial and lead counsel believed he did the same. Though neither counsel remembered reviewing the entirety of the journal entries in the property room prior to trial, the record indicates trial counsel were aware of the victim's prior statements and prepared the defense of the petitioner accordingly. As noted above, both lead and local counsel testified they engaged in thorough communications with the petitioner and learned his explanations for the allegations of abuse. After doing so, trial counsel made the strategic decision to present a defense wherein they attempted to identify the victim's motives for making false allegations against the petitioner. Though the jury did not agree with the defense theory, nothing in the record indicates trial counsel were deficient by failing to review the entirety of the victim's journals. Rather, the record shows trial counsel were aware of the victim's prior statements, including the ones made in the journals, which they used to support their defense theory. Though the petitioner argues a more thorough investigation into the victim's journals would have changed the outcome of his trial, we are not persuaded. The entire defense strategy relied on the theory that the victim fabricated the allegations against the petitioner, and trial counsel utilized the victim's journals to that end. The petitioner is not entitled to relief.

Similarly, the petitioner asserts trial counsel were ineffective for not putting forth evidence of the blank journals the petitioner found in the victim's room as corroborating evidence of the victim's "trial testimony of a scheme to fabricate journal entries." As to this issue, the post-conviction court stated: "There is absolutely nothing unusual about the fact that a teenage girl, who regularly journaled, would have additional blank journals in her room. Thus, the [c]ourt finds that the [p]etitioner was not prejudiced in this respect by trial counsel's failure to review all of the journals." Again, we agree. Nothing in the record demonstrates trial counsel's strategy regarding the victim's journals was not

sound, and the petitioner has failed to show that trial counsel's strategy regarding their review of the journals amounted to deficient performance. *Strickland*, 466 U.S. at 689; *see* Tenn. Code Ann. § 40-30-110 (f); *Goad*, 938 S.W.2d at 369. The petitioner is not entitled to relief.

### III.    Right to Testify

Finally, the petitioner argues trial counsel was ineffective for failing to adequately consult with him regarding his right to testify, arguing "he had a lot to offer his defense had he taken the witness stand during trial." In reviewing this issue, the post-conviction court found "the case was presented according to the [p]etitioner's wishes and that he was extensively involved in all such decisions." Our review of the record reflects that of the post-conviction court.

As explained at the post-conviction hearing, after preparing the petitioner's case for trial, local counsel advised the petitioner not to testify. Lead counsel agreed and advised the petitioner of the same. The petitioner stated he decided not to testify after hearing the victim recant at trial and discussing the same with trial counsel. After doing so, the petitioner engaged in a *Momon* colloquy and relinquished his right to testify. Trial counsel explained, and it is evident in the record, the petitioner was very involved in the preparation of his defense, and he communicated freely with trial counsel throughout their representation. The post-conviction court accredited trial counsel's testimony, and nothing in the record preponderates against its factual findings. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Therefore, in reviewing the record as a whole, it is clear the petitioner waived his right to testify after discussing his options with trial counsel. Further, the record indicates the petitioner engaged in a *Momon* hearing during which he affirmed he understood his options regarding his right to testify and waived the same. *Momon v. State*, 18 S.W.3d 152, 163 (Tenn. 1999). The petitioner is not entitled to relief.

At the post-conviction hearing, the petitioner offered his explanation of the allegations against him which he would have testified to at trial. However, in doing so, the petitioner admitted to touching the victim's hymen, to taking "naked naps" with the victim, and to having an erection during a nap with the victim. Though the petitioner believes he could have justified his actions by explaining his "purity" beliefs to the jury, we are not convinced. As noted by the post-conviction court, "the State's case was very strong" against the petitioner, and the petitioner's proposed trial testimony would not have overcome the overwhelming amount of evidence presented by the State which included the petitioner's own admissions to the abuse of the victim. The petitioner is not entitled to relief as to this issue.

*Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE